## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **DEMETRIUS MORGAN,** | **2:20-CV-12892-TGB-APP** |
| Petitioner, | HON. TERRENCE G. BERG |
| vs. | **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND GRANTING PETITIONER PERMISSION TO PROCEED IN FORMA PAUPERIS ON APPEAL** |
| **LES PARISH,** | |
| Respondent. | |

Demetrius Morgan, a Michigan state prisoner, has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. He filed the petition pro se; an attorney later appeared and filed a reply. Morgan challenges his convictions for committing first-degree premeditated murder, MCL § 750.316, being a felon in possession of a weapon, MCL § 750.224(f), and possessing a firearm while committing a felony, MCL § 750.227b. Morgan raises four claims for relief.

The Court denies the petition, denies a certificate of appealability, and grants Morgan leave to proceed in forma pauperis on appeal.

## I. BACKGROUND

Morgan's convictions arise from the murder of David Holmes. As recited by the Michigan Court of Appeals, the following facts are

presumed correct on habeas review. *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)).

> Defendant's convictions arose from a homicide that took place outside a Citgo gasoline station at the corner of Chalmers St. and Houston Whittier St. in Detroit during the early-morning hours of September 10, 2015. The victim was shot several times at close range. The prosecution's theory of the case was that defendant was affiliated with a gang that regarded that gas station as part of its territory and that the victim had "intruded" on the territory. The defense conceded that defendant was present at the gas station for some of the time that the victim was there but maintained that defendant had left the premises at the time of the shooting and was misidentified as the shooter.

> The homicide was captured by surveillance video equipment, but it was not possible to identify the shooter from the resulting imagery, although the footage did appear to show the shooter wearing some apparel similar to what defendant was wearing earlier that night. The sole eyewitness to the homicide was a non-speaking deaf man, who during the investigation twice selected defendant's image from a photographic lineup, and who at trial, with the assistance of two sign-language interpreters, identified defendant as the shooter—albeit with some apparent equivocation. The prosecution also presented evidence that a gang known as "Chedda Ave" trafficked in narcotics in, and asserted control over, the area of the homicide, and that defendant was known publicly as a member of a rap group with the same name.

> Defendant's cousin told the police that defendant had come

to her home that night and remained there through the time of the shooting.[1] Defendant in turn testified that he went to his cousin's home from the Citgo station, but that he then changed clothes and visited a casino for about 15 minutes. A police officer testified that defendant had telephone conversations with his mother while he was incarcerated as a suspect in this case, and that in those calls they talked about an alibi and the mother advised defendant not to say anything about the casino.

_____

[1]She later stated that she did not "know if he left or not because [she] went to sleep."

*People v. Morgan*, No. 335855, 2018 WL 6252031, at *1 (Mich. Ct. App. Nov. 29, 2018).

A jury in Wayne County Circuit Court convicted Morgan of first-degree premeditated murder, possession of a firearm by a felon, and possession of a firearm during the commission of a felony (i.e., felony firearm). Morgan was sentenced to life without parole for the murder conviction, two years for the felony firearm conviction, and two to five years for the felon-in-possession conviction.

Morgan filed an appeal in the Michigan Court of Appeals, raising four claims through counsel and four additional claims in a pro se supplemental brief. The Michigan Court of Appeals affirmed Morgan's convictions. *Morgan*, 2018 WL 6252031, at *1.

Morgan applied for leave to appeal in the Michigan Supreme Court. He raised the same claims presented to the Michigan Court of

Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Morgan*, 929 N.W.2d 341 (Mich. 2019).

Morgan then filed the pending petition for a writ of habeas corpus. He asserts that (1) insufficient evidence established Morgan's identity as the shooter; (2) a biased juror denied Morgan his right to an impartial jury; (3) the introduction of evidence regarding gangs and rap lyrics violated the First and Fourteenth Amendments; (4) trial counsel was ineffective for failing to (a) move to suppress Billy Price's pre-trial identification, (b) move to quash the bind-over or for a directed verdict, (c) rehabilitate or excuse a biased juror, and (d) object to hearsay testimony.

## II. LEGAL STANDARD

Section 2254 habeas petitions are governed by the heightened standard of review outlined in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' [must] show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). The focus of this standard "is not whether a federal court believes the state court's determination was incorrect

but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Moreover, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. DISCUSSION

#### A. Sufficiency of the Evidence

Morgan argues that insufficient evidence was presented to establish his identity as the shooter.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On habeas review, the sufficiency of the evidence inquiry involves "two layers of deference": one to the jury verdict and a

second to the Michigan Court of Appeals' decision. *Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*

The Michigan Court of Appeals rejected Morgan's sufficiency-of-the-evidence argument:

> Appellate counsel argues that the sole eyewitness's equivocation in identifying defendant at trial as the shooter left the jury without a sufficient basis for concluding beyond a reasonable doubt that defendant was in fact the guilty person. We disagree.
>
> ***
>
> In this case, the eyewitness unequivocally testified that he had selected defendant's image at the photographic lineups presented to him as part of the investigation, but when asked to identify defendant at trial, the witness could not seem to avoid some equivocation. When the prosecutor later asked the eyewitness if he realized that the picture he selected from the lineup was of defendant, the witness replied, "He didn't have a big face he had a small face he

didn't have a big head he had a small head ... almost like a rat face," adding, "almost like he had think [sic] eyebrows he had these big eyebrows you know I think that's the picture."

A jury could have reasonably viewed the eyewitness's apparent equivocation over a matter not actually in doubt (i.e., that the picture the eyewitness chose was a picture of defendant) as signaling that the witness's nervousness, or other excitement, in the trial setting caused him to pepper his identifications of defendant with impressions relating to how a photograph of a person might not perfectly match that person's later personal appearance.

Further, the sign-language expert offered a benign explanation for what might otherwise seem a striking inconsistency in the eyewitness's statements. Confronted at trial with indications that while the investigation was in progress he had told the prosecution that he had seen the shooter "many times" before, the eyewitness replied, "I said I never saw him before." Asked if his expertise in American sign language suggested an explanation for the apparently inconsistent answers, the expert offered the following response:

> As an interpreter the word ["]defendant["] makes us pause. Should make us as interpreters pause because [deaf] people ... don't have the same exposure [to words] like ["]defendant["] that we have.
>
> ... He does not know what the word defendant is. So how I would sign the word defendant to him is built up in the conversation before court starts.

7

> Some interpreters have been legally trained do it [sic] and some don't.
>
> And if he didn't know what the word defendant means as you can see on the video, he will answer a question without knowing exactly what it is.
>
> So if he responded I've never seen him before did he know he was talking about the defendant or the victim ... [?]

The eyewitness's deafness, combined with his apparent nervous or otherwise excited answers to questions, did indeed present special challenges to the jurors in weighing that witness's testimony. But even when a witness's identification of the defendant is less than 100% solid, the question remains one for the jury…

In this case, in addition to the eyewitness's seemingly equivocal identification at trial, the jury had for its consideration the evidence of that witness's emphatic selection of defendant's image each time a six-image photographic array was shown to him. Also in evidence was defendant's own account of being at the subject Citgo station near the time of the shooting. Also, even if not conclusive by itself, good circumstantial evidence linking defendant to the crime was that the shooter, as described by the eyewitness, was wearing black pants and red shoes similar to what defendant was wearing while admittedly at the Citgo.

Further, defendant described going from the Citgo to his cousin's home, changing clothes, then spending only a token amount of time at a casino. The prosecution's theory that

defendant took those actions to create evidence suggesting an alibi was bolstered by the evidence of a second attempt to manufacture an alibi not consistent with defendant's own. In particular, defendant's cousin included specific times of day with her statements to the police about defendant's having spent time at her house on the night in question, but the times did not comport with defendant's account of briefly visiting a casino, or with the surveillance footage showing defendant at both the Citgo and the casino, and the cousin admitted offering her statement to the police in the first instance in hopes of providing defendant with an alibi. The evidence further indicated that defendant's mother, in a telephone conversation with defendant after he was arrested, admonished him to not to speak of his visit to the casino, as if recommending the cousin's manufactured alibi over defendant's own.

For these reasons, we reject appellate counsel's challenge to the sufficiency of the evidence to support the verdict at trial.

*Morgan*, 2018 WL 6252031, at *4–5.

In addition to the evidence discussed by the Michigan Court of Appeals, recordings of telephone calls Morgan made from jail while awaiting trial were played for the jury. While neither the recordings nor transcripts of these recordings are part of the record before the Court, Morgan discusses the substance of one call in his state court pro per supplemental brief. He referenced a recorded "phone call, in which he said that he had concluded, after reviewing all the police reports, that the deaf man was telling the truth." ECF No. 8-17, PageID.2144.

Morgan contended this was not an admission of guilt but an acknowledgment that Price's statement was consistent with the other evidence. *Id.* Even if Morgan's interpretation of this statement is reasonable, it would have been equally reasonable for a juror to conclude that this was an admission of guilt.

Moreover, much of Morgan's argument rests on attacking the quality of Price's identification. But that argument amounts to asking this Court to reweigh Price's credibility. "It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). On habeas review, a federal court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Id.*

There was testimony that Price identified Morgan as the shooter in two separate photo lineups. Regardless of the presence of an interpreter, witnesses also testified that Price's body language indicated which photo he selected.

In sum, while subject to impeachment, Price's identification testimony was sufficiently sound that a rational juror could accept it. Taking Price's identification of Morgan in consideration together with his jailhouse telephone call, the similarity of his clothing with that of the shooter's, Morgan's presence at the gas station very close in time to the shooting, and additional circumstantial evidence, a reasonable juror

could have found Morgan guilty beyond a reasonable doubt. The Michigan Court of Appeals' rejection of Morgan's claim was not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented at trial.

## B. Biased Juror

Morgan argues that he was denied his right to an impartial jury because during voir dire a juror stated that he had previously been robbed at knifepoint. The juror was never asked whether he could set that experience aside and consider Morgan's case based on the evidence presented. Specifically, the trial court asked if any prospective jurors had "ever been the victim of a crime." ECF. No. 8-5, PageID.328. The following exchange then occurred:

> Juror No. 12: Robbed at knifepoint as a paper boy long–a long time ago.
>
> The Court: You got robbed at knifepoint?
>
> Juror No. 12: Yes.
>
> The Court: So did I when I was a paper boy.
>
> Juror No. 12: Free [P]ress.
>
> The Court: That's a coincidence.

*Id.* at PageID.328–29.

In response to a later question to prospective jurors about

connections to law enforcement officers, Juror No. 12 stated that he was friends with a Wayne County prosecutor and a state district court judge. He noted that he could, nevertheless, "be fair." *Id.* at PageID.333.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. The right to an impartial jury is made applicable to the states by the Fourteenth Amendment. *Turner v. Louisiana*, 379 U.S. 466 (1965). "At its core, this right to an 'impartial' jury prohibits a court from empaneling jurors who have a personal bias against the defendant or who have decided on the defendant's guilt before hearing any evidence." *United States v. O'Lear*, 90 F.4th 519 (6th Cir. 2024) (citing *Irvin v. Dowd*, 366 U.S. 717, 722–28 (1961); *United States v. Burr*, 25 F. Cas. 49, 50–51 (C.C.D. Va. 1807) (No. 14, 692G) (Marshall, C.J.)). Jurors are presumed impartial. *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723). The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)).

When considering juror bias, the first question is whether the juror swore under oath "'that he could set aside any opinion he might hold and decide the case on the evidence,' and whether that 'protestation of impartiality' ought to be believed." *Id.* (quoting *Patton v.*

12

*Yount*, 467 U.S. 1025, 1036 (1984)). A "state court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness." *Id.*

The Michigan Court of Appeals applied the correct standard of review, and Morgan has not rebutted the presumption of correctness afforded to the state court's finding that the juror was impartial. Further, the fact that Juror No. 12 was the victim of a crime when he was a child does not rebut the presumption of juror impartiality. Therefore, Morgan has not shown that the state court's decision was contrary to or an unreasonable application of Supreme Court precedent. Habeas relief is denied.

### C. Admission of 'Other Act' Evidence

In his third claim, Morgan argues that the admission of evidence regarding street gangs, rap songs, and rap lyrics violated the First Amendment's Free Speech and Freedom-of-Association Clauses and the Fourteenth Amendment's Due Process Clause.

The Michigan Court of Appeals reviewed Morgan's unpreserved First Amendment claim under a plain error standard and found no error.[1] The state appellate court found the evidence relevant to the

---

[1] AEDPA's deferential standard of review applies to a state court's plain-error analysis of a defaulted claim. *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017). The Court need not address Respondent's argument that this claim is procedurally defaulted. Procedural default is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required

prosecution's theory of the case:

> [E]vidence of membership in a rap group which adopted the name of the gang asserting control over the area at issue and whose expressive activities included publicly celebrating dominion over the Citgo station at issue showed at least a solid personal and regional affinity with that gang and thus had direct bearing on the prosecution's theory that the subject murder was committed as an assertion of territorial dominance.

*Morgan*, 2018 WL 6252031, at *7.

The court of appeals recognized Morgan's constitutional right "to indulge in an artistic celebration of violent inner-city culture, or otherwise to display a personal affinity with a gang, but not to keep a jury from learning of such things when they bore on the prosecution's theory of the case." *Id.*

The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). But, in *Dawson v. Delaware*, 503 U.S. 159, 165 (1992), the Supreme Court held that the First Amendment does bar the admission of evidence relating to a defendant's "abstract beliefs…when those beliefs have no bearing on the issue being tried." *Dawson*, 503 U.S. 159, 167 (1992). In this case, the

---

to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

admitted evidence did not bear strictly and exclusively on Morgan's abstract beliefs. It was, as the state court held, relevant to Morgan's motives, his connections to a gang that exercised territorial control over the Citgo station and, ultimately, his identity as the shooter. Accordingly, admission of this evidence did not violate the First Amendment.

Morgan also argues that the admission of this evidence violated due process. The admission of evidence may violate the Due Process Clause (and thereby provide a basis for habeas relief) where the admission "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (2003). The Supreme Court "defined the category of infractions that violate fundamental fairness very narrowly." *Estelle v. McGuire*, 502 U.S. 62, 73 (1991). To violate due process, an evidentiary decision must "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (citation omitted). This standard accords with the state courts' "wide latitude…with regard to evidentiary matters under the Due Process Clause." *Id.*

The Michigan Court of Appeals held that the evidence was relevant and not unfairly prejudicial. A police detective assigned to

combat street gangs and gang-related crime in the area, which included the Citgo station, testified that the area was controlled and threatened by the "Chedda Ave" gang. His investigation into the murder uncovered numerous pieces of evidence linking Morgan to the Chedda Ave gang, including photos of Morgan atop the Citgo station and rap lyrics referencing a dead body at the station. The state court's decision that the admitted evidence was relevant to establish Morgan's connection to the gang and motive to commit the offense was not so egregious as to render Morgan's trial unfair.

The Michigan appellate court's decision was not contrary to or an unreasonable application of Supreme Court precedent. Morgan has not established that the state court's relevance determination was unreasonable or incorrect. Nor has he shown that the admission of gang-related evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (2013) (internal quotation and citation omitted).

Finally, to the extent that Morgan argues that the admission of this evidence violated Michigan Rules of Evidence, he fails to allege a basis for federal habeas corpus relief. Errors of state law, particularly the alleged improper admission of evidence, do not allege a constitutional violation upon which habeas relief may be granted. *See Estelle v. McGuire*, 502 U.S. 62 (1991).

### D. Ineffective Assistance of Counsel

In his fourth claim, Morgan argues that his trial counsel rendered constitutionally ineffective assistance when counsel failed to (a) move to suppress Billy Price's pre-trial identification, (b) move to quash the bind-over or for a directed verdict, (c) rehabilitate or excuse a biased juror, and (d) object to hearsay testimony.

A violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was so deficient as to have prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish that an attorney's deficient performance prejudiced the defense, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Where a state court has decided a claim on the merits, the standard for obtaining habeas corpus relief is "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Metrish v. Lancaster*, 569

U.S. 351, 358 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland*, the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted).

**1.**

First, Morgan argues that defense counsel was ineffective for failing to move to suppress Billy Price's out-of-court identification of Morgan.

The Michigan Court of Appeals held that counsel was not ineffective because the identification was not tainted by improper suggestiveness, and counsel was not required to file a meritless motion. The state court explained:

> Appellate counsel asserts that the eyewitness's deafness "made it impossible for him to communicate with hearing, speaking persons." Appellate counsel, however, exaggerates the eyewitness's communication capabilities. Even persons with normal hearing often supplement speaking and listening with other forms of communication, such as gestures and writing. Appellate counsel does not dispute the credentials or performance of the interpreters who assisted the eyewitness at trial, or of the one who assisted with part of the investigation and appeared as an expert at trial. Although the eyewitness's deafness presented special challenges in communicating with the police, and at trial,

those challenges were not insurmountable.

Appellate counsel additionally states that the eyewitness, "apparently, from the evidence presented, could not read or write effectively," but offers no record citations to support that assertion. In fact, the record shows that the eyewitness could sign his name, and otherwise leaves unanswered the question of his general state of literacy. Regardless, in making issue of the eyewitness's reading ability, appellate counsel mentions only that the eyewitness signed a statement prepared for him early in the investigation as an instance where written words came into play in connection with that witness. But counsel does not assert, let alone offer a record citation to show, that this printed statement was relied upon by anyone involved in the case thereafter. Further, the sign-language expert offered compelling testimony at trial to the effect that the eyewitness's entire initial interview with the police, relying on the limited interpreting abilities of one officer, resulted in no useful or reliable information, including the statement the eyewitness signed. Although appellate counsel suggests that the eyewitness's offering of "statements to various law enforcement parties without the benefit of a proper interpreter" resulted in a tainted identification of defendant, counsel presents no reason to suppose that anything from the interview involving the officer with poor signing capabilities was suggestive of defendant as the shooter.

Appellate counsel also offers no argument impugning either of the photographic lineups from which the eyewitness selected defendant's image, and the descriptions of those proceedings at trial included no basis for supposing that any such impropriety tainted the identifications. A police

sergeant described visiting the eyewitness at the latter's workplace, where the two were assisted in communications only by the eyewitness's coworker or supervisor, and individually displaying for the eyewitness six photographs, from which the eyewitness showed obvious excitement over the image of defendant and none other. The police sergeant described gestures from the eyewitness that required no expert to interpret, explaining that "he emphatically pointed at the picture and tapped it several times" and also "gestured ... with his hands in the shape of a handgun and pointed at the picture ... and made several motion[s] with his hand as if he were shooting someone on the ground." The police sergeant additionally testified that the police had no suspect in view when trying to communicate with the eyewitness earlier in the investigation such that they might have suggested, then, a possible suspect to him. The sign-language expert in turn described acting as interpreter when the eyewitness was again presented with the photographic lineup; he described how the eyewitness, upon reaching defendant's image, "was pointing and pointing that's the shooter ... as he pounded on the page." The expert stated that he was physically reacting to defendant's image such that "you almost didn't even need to know sign language" to understand that the eyewitness was emphatically identifying defendant. Further, the sign-language expert made clear that for his part in interpreting for the eyewitness, "[h]is reading abilities ... wouldn't play a part at all," effectively neutralizing appellate counsel's speculations concerning the eyewitness's ability to read.

Appellate counsel argues that the eyewitness's performance at the preliminary examination did not include a reliable identification of defendant as the shooter, and points out

some apparent inconsistencies in what the eyewitness had to say, but appellate counsel does not argue that the proceeding itself infected the eyewitness with some improper suggestion that defendant was the guilty person.

Further, although appellate counsel complains about the lack of proper "translations" of the eyewitness's sign-language communications, appellate counsel stops short of impugning the credentials, or of offering examples of inaccuracy, of the persons who performed that function at trial or of the person who was recognized as an expert at trial and who also assisted in the investigation.

In sum, although the eyewitness's deafness presented special communication problems, appellate counsel has failed to show that the police or prosecution did not recognize those challenges and meet them head on.

Appellate counsel has failed to show that the eyewitness's identification of defendant as the shooter was tainted by improper suggestiveness. Because the eyewitness appeared at trial with no improper taint regarding his ability to identify defendant, defense counsel would have had nothing to gain from seeking to suppress that identification. A trial attorney is "not required to argue a frivolous or meritless motion." *People v. Gist*, 470 N.W.2d 475 (Mich. Ct. App. 1991).

*People v. Morgan*, No. 335855, 2018 WL 6252031, at *3–4 (Mich. Ct. App. Nov. 29, 2018).

An identification violates a criminal defendant's due process rights if the procedure is so unnecessarily suggestive that it gives rise to

a very substantial likelihood of irreparable mistaken identification. *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972); *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005). The petitioner bears the burden of showing impermissible suggestiveness, *Howard*, 405 F.3d at 469, and the analysis is two-part: the court first assesses whether the identification was unnecessarily suggestive, and if so, the court determines whether the identification was nonetheless reliable. *Id.; Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001).

Here, there were undoubtedly difficulties with communication during the lineups. Still, no evidence shows that police suggested who Price should pick from the lineup, and Price's nonverbal cues were clear and did not require an interpreter. Defense counsel attempted to use the interpreter issue and resulting confusion to Morgan's strategic advantage to argue that Price's identification was unreliable. The Michigan Court of Appeals' conclusion that counsel was not ineffective for failing to challenge Price's identification is not contrary to or an unreasonable application of *Strickland*.

## 2.

Second, Morgan maintains that counsel was ineffective for failing to move to quash the bind-over or for a directed verdict.

Morgan raised these claims in a motion for a new trial filed in the trial court. The trial court held that neither motion was likely to succeed, and that counsel performed within the wide range of

reasonably competent assistance when he decided not to file these motions. *See* ECF No. 8-13, PageID.1078–1081. Moreover, Morgan's lawyer objected to the bind-over on the record. He did not file a separate motion to quash, which he might have reasonably thought was meritless. Defense counsel's failure to move for a directed verdict based on the insufficiency of evidence was not ineffective assistance of counsel because, as discussed, sufficient evidence supported Morgan's conviction. *See Maupin v. Smith*, 785 F.2d 135, 140 (6th Cir. 1986) (holding that where there was sufficient evidence to support petitioner's conviction, petitioner could not establish he was prejudiced by counsel's failure to move for a directed verdict).

### 3.

Next, Morgan argues that counsel was ineffective for failing to rehabilitate or excuse Juror No. 12. The Michigan Court of Appeals rejected this claim:

> [D]efense counsel actively participated in jury selection, including by exercising multiple peremptory challenges. Contrary to defendant's argument, there is simply no basis from which to conclude that counsel was ineffective by failing to further question the juror, especially when the juror explicitly stated (albeit in the context of discussing his friends in the legal system) that he could be a fair juror.

*Morgan*, 2018 WL 6252031, at *8.

As discussed above, Morgan has offered no evidence to rebut the

state court's determination or the general presumption that Juror No. 12 could be impartial. Because there was no evidence of actual bias denying Morgan his right to an impartial jury, Morgan was not prejudiced by counsel's performance.

**4.**

Finally, Morgan maintains that counsel was ineffective for failing to object to the admission of hearsay testimony. Specifically, the victim's cousin, Rakeem Holmes, testified that Morgan called him after a candlelight vigil to say he "heard [Rakeem's] family was saying that he did it and stuff like that." ECF No. 8-6, PageID.541. The Michigan Court of Appeals held that counsel was not ineffective for failing to object because the evidence was not offered to prove the truth of the matter asserted, and even if it was provided for that purpose, Morgan was not prejudiced by its admission.

The state appellate court's decision was reasonable. It is unlikely that an objection would have succeeded, given that the testimony was probably offered to show Morgan's concerns, not to show what the victim's family believed. Trial counsel may have reasonably decided not to object to the remark to avoid drawing attention to it. Further, even if counsel erred by failing to object, Morgan fails to show that this isolated remark prejudiced him.

24

## IV. CONCLUSION

For the above reasons, Morgan's petition for a writ of habeas corpus is **DENIED**. The Court further finds that reasonable jurists would not debate this Court's resolution of Morgan's claims, so issuance of a certificate of appealability is also **DENIED**. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). If Morgan nonetheless chooses to appeal, he may proceed in forma pauperis. *See* 28 U.S.C. § 1915(a)(3). This case is **DISMISSED WITH PREJUDICE.** This is a final order that closes this case.

**SO ORDERED.**

Dated: April 9, 2024               /s/Terrence G. Berg
                                   HON. TERRENCE G. BERG
                                   UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served via electronic and/or ordinary mail.

Dated:  April 9, 2024                    By:  /s/T. McGovern
                                                            Case Manager


                          BY THE COURT:

                          /s/Terrence G. Berg
                          HON. TERRENCE G. BERG
                          UNITED STATES DISTRICT JUDGE